# SUPREME JUDICIAL COURT,

##### IN THE

## COUNTY OF SUFFOLK, MARCH TERM, 1809,
## AT BOSTON.

———◆———

PRESENT:

Hon. THEOPHILUS PARSONS, Chief Justice.
Hon. THEODORE SEDGWICK,
Hon. SAMUEL SEWALL,
Hon. GEORGE THATCHER, } Justices
Hon. ISAAC PARKER,

———◆———

## John Brazier & Al. *versus* William Clap.

How far a mistake arising from the ignorance of the master shall excuse a deviation, and when a deviation arising from such ignorance shall discharge underwriters. [Where a master of competent skill and discretion acts *bona fide*, according to his best judgment, under the existing circumstances, though he commit a mistake, and a loss happens, the underwriters will be liable.]

This was an action of the case upon a policy of insurance, dated November 26, 1802, upon the ship *America* and cargo, at and from *Boston* to *New Orleans*, and at and from thence to *Boston*, or her port of discharge in the *United States*. The plaintiffs claim as for a total loss by shipwreck.

At the trial of the cause before *Parker, J.*, the plaintiffs proved their property in the vessel and cargo to the amount insured, and that they were lost on *Florida* Reef on the 19th of December, 1802.

The defence consisted of two points:—1st. That the vessel was

wilfully wrecked by the master; and 2d. That there was a deviation, which avoided the policy.

[ * 2 ]    * As to the first point, the evidence was so slight, that the judge did not apprehend the cause turned at all upon it.

As to the second point, it appeared from the log-book, that the ship sailed on the 26th of November, 1802, having a *Vineyard* pilot on board, the captain intended to stop at the *Vineyard* to put the pilot on shore, and also the captain's wife, who was on board; that the intention to go by that route was known to the plaintiffs, but was not communicated to the underwriters.

It appeared also from the log-book, that, from the 26th to the 30th of November inclusive, the wind was at North-West, and when the ship was up with *Cape Cod*, by the captain's orders they hauled up for *Nantucket*, intending to go through the *Vineyard Sound*. Not being able to lay their course, they beat up for *Edgartown* in the *Vineyard*, and after having anchored several times, arrived there on the 29th; and the weather being unfavorable in the opinion of the captain, and also of the pilot, they remained there until the third of December, when they proceeded on their voyage.

The defendant's counsel contended at the trial that the ship ought to have gone to sea through *the South Channel*, that being, as they alleged, the usual course of vessels bound to *New Orleans* or the *West Indies*; and that the going over the shoals, through the *Vineyard Sound*, was a deviation; and they produced nine experienced masters of vessels, all of whom swore that the safest and usual route was by the South Channel, that the wind at North-West was perfectly fair, and that they should not have thought themselves at liberty to take any other course.

The plaintiffs' witnesses testified that they considered one way as safe as the other; but upon cross examination it appeared they generally spoke of voyages in small vessels to the Southern ports of the *United States*, and not to the *West Indies* or *New Orleans*.

[ * 3 ]    * One witness only considered the *Vineyard Sound* as usually taken as the South Channel for a voyage to the *West Indies*; and some of the plaintiffs' witnesses confirmed the testimony of those produced by the defendant.

The charge of the judge to the jury was in substance as follows:—That the contract with the underwriters in the policy is, that the vessel shall pursue the voyage insured in the most safe and usual route for vessels of such description; that if the master voluntarily depart from such route, whether with or without the consent of the owners, and the intention so to do is not communicated to the underwriters, the contract is void; that they had first to inquire, whether either of the routes mentioned in this case had so far acquired an ascendency over

2

BRAZIER & AL. *vs.* CLAP.

the other in the opinion and practice of navigators, as to obtain the character of the *usual* route ; that after settling that point, if they found there *was* such a route, they were then to inquire whether that route had been pursued by this vessel on the voyage insured ; that if they found it had been, the case was with the plaintiffs ; if it had not been, they were next to inquire whether the departure from the known and usual route was from *necessity,* or mistake ; if from either of these causes, the policy was not affected by it ; but if they found, from the evidence in the cause, that the departure was voluntary, for the personal convenience of the captain, the underwriters must be discharged.

The jury, after being out upwards of an hour, returned without having agreed on a verdict. Being asked by the judge on what point they differed, they stated that they were all agreed that the South Channel was the usual and safest course ; and that the vessel had not taken that course, but had gone over the shoals. The judge then informed them, that they had only to inquire whether the deviation was *necessary* or not ; having in the mean time satisfied himself that he had *laid down the law too liberally for the plaintiffs, [ *4 ] in stating to the jury that the *mistake* of the captain would excuse the deviation (a). In a few minutes the jury returned with a verdict for the defendant. No objection was made to the charge at the time ; but on the sitting of the court by adjournment, about a fortnight after the trial of the cause, a motion was made by the plaintiffs' counsel for a new trial, for a misdirection to the jury.

And now *G. Blake,* in support of the motion, contended that the direction of the judge, from which the jury were led to believe that nothing less than necessity would in any case excuse a deviation, was too narrow. If it were established in the case that the master took the route, which he did, for the sole purpose of putting his wife on shore at the *Vineyard,* it would not 'be attempted on the part of the plaintiffs to justify or excuse such a departure. But the jury doubted if such intention was proved, and the last intimation from the judge, of which the plaintiffs complain, probably governed them. We contend that a physical necessity need not be shown, to excuse a deviation from the most direct course ; but wherever, in the exercise of an honest discretion, and with no corrupt views, the master varies from the direct course, such a departure will not avoid the policy (1).

The "*justa causa*" of Lord *Mansfield* in the case of *Pelly* vs. *Royal*

(a) A mere mistake of the master will not discharge the underwriters. If the master be competent for the voyage, and the loss be by a peril of the seas, the underwriters are liable ; for *causa proxima et non remota spectatur.* *Walker* vs. *Maitland,* 5 B. & A. 171.— *Bishop* vs. *Pentland,* 7 B. & Cr. 217.— *Shore* vs. *Benthall,* 7 B. & Cr. 798 (n.)—*Holdworth* vs. *Wise,* 7 B. & Cr. 799.—*Busk* vs. *Roy. Exch. Ins. Co.* 2 B. & A. 72.—*Phillips* vs. *Head- lam,* 2 Barn. & Ad. 380	(1) *Marsh.* 408

*Exchange Assurance Company* (2), and which he says always excuses a deviation, is very distinct from the physical necessity, which the judge adhered to in the trial of the case at bar. The facts in the case of *Bond* vs. *Nutt* (3) show a very wide departure from the usual course of the voyage; yet it was held no deviation, because the [ * 5 ]   intention was apparent * to come by the safest route. In the present case, no increase of the risk appears, although perhaps the other was the more usual route. Having a pilot on board, the master might well consider himself as safe, as he would have been to have attempted the passage by the South Channel without a pilot (4).

*The Solicitor General,* for the defendant, insisted that the direction of the judge, that a deviation must be from necessity, and that the mistake of the master would not be an excuse, was substantially correct.

When the judge stated to the jury, that the *mistake* of the master would not excuse a deviation, he must have intended such a kind of mistake as resulted from *a want of competent skill to conduct or navigate the ship.* The most intelligent mariner may lose his ship by mistaking one place for another, under circumstances in which it might be impossible for him to arrive at certainty. But when a loss happens in consequence of a mistake, which is the effect of *ignorance*, gross negligence, or want of competent skill in the master; in every such case the underwriters will be discharged. On this point there is an implied warranty in every contract of assurance (5). And in the case of *Phyn* vs. *Royal Exchange Assurance Company* (6), it seems to be taken for granted, through the whole of the case, that the ignorance of the master will discharge the underwriters, if the loss be occasioned thereby. The verdict was found in that case for the underwriters, on the ground that the loss was occasioned by the ignorance of the master, who departed from the safest and most usual route; and although the only question decided in the case was that the master had not, by such deviation, committed an act of barratry, yet if the verdict had been wrong, as discharging the underwriters on account * of the ignorance of the master, it would doubtless have been set [ * 6 ]   aside as against law. But no objection was raised against it upon that ground (7).

But admitting there was a misdirection upon this particular point, yet the defendant is wholly discharged from this policy upon two grounds. *First,* because it appears from the facts before the Court, and from the verdict, that there was a voluntary, and perhaps even a barratrous deviation, without any necessity, from the usual and established

(2) 1 *Burr* 351.                                      (3) *Cowp.* 601.
(4) *See also* 1 *Atk.* 545.—1 *Salk.* 445—2 *Str.* 1265.          (5) *Marsh.* 249. 373.
(6) 7 *D. & E* 505.    (7) *See also Gregson* vs. *Gilbert, cited Marsh.* 594. *and Park,* 62.

course of the voyage, by leaving the South Channel, when the wind was perfectly fair, and attempting an unusual and hazardous passage in another direction. This deviation cannot be justified or excused by any of the causes which the law receives in such cases. It was not necessary from stress of weather, for necessary repairs, to join a convoy, to avoid enemies, or from a mutiny of the crew. And these are the only causes which the law recognizes to justify or excuse a deviation (8).

*Secondly.* The underwriters are discharged, because the intention to go out of the usual track, and to stop at the *Vineyard*, was known to the assured before the ship sailed, and was not communicated to the underwriters. The books are full of cases and decisions upon this point; and the law is clearly settled, that where a concealment of this kind is practised, the contract is annulled, and the underwriters are discharged (9).

The plaintiffs' counsel has contended that if the master acted upon the whole according to his best discretion, the deviation is to be excused. In each of the cases cited to this point, the departure was necessary for the purpose of joining a convoy, which was required by the warranties in the respective policies, and was excused or justified for that reason.

* In the case at bar, the Court have to decide whether the    [ * 7 ] master can be justified in this deviation from any necessity apparent in the report. He deviated from the usual and safest route, having a fair wind to proceed in that course. In taking the course he pursued, he had to contend with contrary winds, in a large ship, with a valuable cargo, through a passage of dangerous navigation, and particularly hazardous at that season, for no other object than to land a pilot, whom he had unnecessarily taken on board, or to land his wife, in which he must have consulted his own convenience only. The fact of deviation is established, and cannot be justified or excused by either of the above causes.

*Dexter*, in reply. The objection of the plaintiffs to the verdict in this case arises out of the second direction to the jury, *viz.* that they had only to inquire whether the deviation was necessary. They were thus made to understand that the mistake of the master could in no case excuse a departure from the usual course. If this is a just position, no objection can lie against the verdict. It is undoubtedly true that the owner of a ship is bound to provide a master of ordinary skill and capacity; and if a loss happen from the want of such skill and capacity, the underwriters would not be held, but the owner must suffer the effects of his own indiscretion. Mistakes arising from gross

---

(8) *Marsh.* 408 409. 392. *et seq.*          (9) **7** *D. & E.* 162.—*Marsh.* 233. 407.

ignorance or negligence are at the risk of the owner. But there may be many mistakes of another description, and the jury are the proper judges of the cause and nature of the mistake charged in any case. Losses arising notwithstanding the use of ordinary skill and care, must be chargeable to underwriters. If it were otherwise, scarcely a loss could ever be recovered. Every accident of stranding may probably be traced in some degree to a slight mistake of the master natural to the hurry and anxiety of his situation. So perhaps there was never a voyage performed, in which a deviation from a course pre-[ * 8 ] cisely * the most direct did not take place. Before the late improvements in the art of navigation, it was usual to run for particular places, in order to ascertain the place of the ship, and to take a new departure. This was plainly a deviation; but such a deviation was never urged in avoidance of a policy of insurance. A deviation may arise from the honest mistake of the master as to a fact, as if he be falsely informed that there are cruisers in the route he is pursuing; yet if on such grounds underwriters are held discharged, the practice of insurance will serve little purpose but to put premiums into their pockets.

If the master in this case acted with honest intentions, and in the use of ordinary skill and discretion, the underwriters ought to be held to respond for the loss. And the question, whether he did so act, ought to have been left to the jury. If the facts in this case were found by a special verdict, it would be useless to send the cause to another trial; but there is now before the Court a mere report of evidence which the jury were not permitted to weigh. Thus the intention of the master to take the course which he did, is not a fact found by the jury: it was controverted at the trial, and the judge must be understood to mean no more than that there was evidence raising a presumption of the fact. It appears indeed that the jury were not satisfied with the evidence, and would not find the fact. It may be that they believed the previous intention of the master to have been, to put the pilot on shore without going through the Sound, and to take his wife with him through the voyage.

Further, it will not be denied that in some states of the wind, the safest and best course would be through the Sound; and it was therefore a discreet thing to have on board a pilot, whose services would be necessary in such an event. The fact, then, of taking the pilot is no proof of an original intention to take the route pursued un-[ * 9 ] der the * actual circumstances. And it was on this fact only that the charge of concealment rested, which, by the way, was not urged at the trial. The report cannot be understood to mean that the owners actually knew such to be the master's intention, but that they inferred it from the fact of the pilot's being on board. If that fact had been made known to the underwriters, they would have ap-

proved it as a prudent measure, knowing that in a certain event he would be necessary for the safe conduct of the ship.

The opinion of the Court (except of the *chief justice*, who did not sit in the cause) was afterwards delivered by

SEDGWICK, J. [After recapitulating the circumstances of the case as reported by the judge, and his direction to the jury, that they had only to inquire whether the deviation was necessary or not; and in substance that the mistake of the master would be no excuse.] Was this direction correct and legal?

A general position that the mistake of the captain, under no circumstances, forms an excuse for a deviation, is certainly not true. The most skilful, discreet and prudent master may, and probably in almost all long voyages does, commit mistakes, by which his ship may be taken out of the most direct and shortest course. Such is not a deviation that will discharge the underwriters. On the contrary, I believe that, in all instances where a captain of ordinary skill and discretion forms the best judgment that he can, under the existing circumstances, for the interest of all concerned, the contract of insurance remains unimpaired by his pursuing that judgment. But in this case, before the charge of the judge was given, of which the plaintiffs complain, it was ascertained by the jury, that the route pursued was not the *usual* course, and that it was *less safe* than that which was departed from; and this at the commencement *of a voyage, [ * 10 ] when every necessary information might be easily obtained.

I think that such a deviation can only be justified by *necessity*, and that therefore the charge of the judge, taken as it ought to be in relation to the subject matter, was perfectly correct. In other words, as the case then lay before the Court, as the captain had abandoned the route, which, by the finding of the jury, must be taken to be the *usual and safest route*, and had pursued one which was neither the *usual nor the safest route;* and this after evidence had been produced and weighed by the jury for that purpose; and this also done in waters where the most satisfactory evidence as to the best route might be easily obtained,—I cannot imagine that any excuse, not founded in necessity, could excuse the deviation. And I therefore conclude that there is no reason to complain of the direction of the judge.

But even if fault could justly be found with the judge's direction, I do not think that in this case a new trial ought to be granted. A new trial ought never to be granted, when the Court is perfectly satisfied that on a second trial the same verdict must by law be given, although there might have been some mistake in the judge at the trial. Now, in this case, if the captain had ordinary skill, and was informed, as he ought to have been, as to the voyage he was pursuing, no fact which was exhibited at the trial, or is now pretended to have existed, amounts

to any thing like a justification or excuse for the deviation, on which the defendant relies, as having vacated the contract.

If such skill and information were possessed by the captain, the deviation would seem to be merely wanton, or done for the convenience of the captain in landing his wife on the *Vineyard.* On the other hand, if the deviation happened either from the want of skill or the gross ignorance of the captain, that would doubtless defeat [ * 11 ] the claim of the plaintiffs to recover. For among * other things which the law, from the nature of the contract of assurance, imposes as obligations on the assured, is the duty to provide a master of competent skill, prudence and discretion to navigate the vessel; and if any loss takes place, which may be justly supposed to have happened from a master of that character not having been provided, the underwriters are not responsible for it.

If the captain honestly exercised the best judgment he had, and did really believe that the two routes were indifferent, and therefore the deviation is imputable to mistake, it would, in my judgment, when compared with the facts which are established, be such evidence of gross want of skill, or of gross ignorance, or of both, as to afford no excuse for the deviation. In any view, then, of the case, it seems to the Court that a new trial ought not to be granted, but that judgment be entered upon the verdict.